**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**
**BENTON DIVISION**

| | |
|---|---|
| DAVID HEDMAN, Individually and for Others Similarly Situated<br><br>v.<br><br>6TH MERIDIAN SPECIALTIES LLC d/b/a PHOENIX MINING | **Case No. _________________**<br><br>Jury Trial Demanded<br><br>FLSA Collective Action<br>Rule 23 Class Action |

## CLASS AND COLLECTIVE ACTION COMPLAINT

### SUMMARY

1. David Hedman (Hedman) brings this class action to recover unpaid wages and other damages from 6th Meridian Specialties LLC d/b/a Phoenix Mining[1] (Phoenix) for violations of the Fair Labor Standard Act (FLSA), Illinois Minimum Wage Law (IMWL), and Illinois Wage Payment and Collection Act (IWPCA).

2. Phoenix employed Hedman as one of its Hourly Employees (defined below) in Illinois.

3. Phoenix pays Hedman and the other Hourly Employees by the hour.

4. Hedman and the other Hourly Employees regularly work over 40 hours in a week.

5. But Phoenix does not pay Hedman and its other Hourly Employees for all their hours worked, including overtime hours at the required rates.

[1] 6th Meridian Specialties, LLC also does business under the assumed name of Morgan Mining.

6. Instead, Phoenix requires Hedman and its other Hourly Employees to put on gear necessary to perform their job duties, while on Phoenix's (or its clients') premises, before their shifts, "off the clock."

7. Likewise, Phoenix requires Hedman and its other Hourly Employees to exit the mine, walk to their changing facility, change out of and store their safety gear, and shower, after the end of their shifts, "off the clock," while on Phoenix's (or its client's) premises (¶¶ 6-7 together, Phoenix's pre/post shift off the clock policy).

8. But Phoenix does not pay Hedman and the other Hourly Employees for the time they spend putting on, taking off, and storing their gear, moving to and from changing facilities, and showering before and after their shifts.

9. Additionally, Phoenix pays Hedman and the other Hourly Employees "per diems" that are not reasonably calculated to reimburse expenses incurred on its behalf but nonetheless excludes these "per diems" from Hedman's and the Hourly Employees' regular rates of pay for overtime purposes (Phoenix's "per diem pay scheme").

10. Phoenix's pre/post shift off the clock policy and per diem pay scheme violate the IMWL by depriving Hedman and the other Hourly Employees of overtime wages at the required rates, based on all remuneration, for all hours worked after 40 in a workweek.

11. Finally, Phoenix failed to pay Hedman and other former Hourly Employees accrued but unused vacation hours upon termination of employment ("vacation policy").

12. Phoenix's pre/post shift off the clock policy and vacation policy violate the IWPCA by depriving Hedman and the other Hourly Employees of all their earned wages, including final compensation, (at their agreed hourly rates) for all hours that Phoenix agreed to pay them.

## JURISDICTION & VENUE

13. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

14. This Court has supplemental jurisdiction over the state-law subclass claims because they arise from a common nucleus of operative facts. 28 U.S.C. § 1367.

15. This Court has personal jurisdiction over Phoenix based on its substantial contacts with and business done in Illinois, including employing Hedman and other Hourly Employees in Illinois.

16. Venue is proper because a substantial part of the events or omissions giving rise to this claim occurred in Williamson County, Illinois, which is in this District and Division. 28 U.S.C. § 1391(b)(2).

17. Specifically, Phoenix employed Hedman and other Hourly Employees in Williamson County, Illinois under its pre/post shift off the clock policy, per diem pay scheme, and/or vacation policy.

## PARTIES

18. Phoenix employed Hedman as a buggy operator from approximately January 2024 until June 2025, including from April 2025 to June 2025 in the Mach #1 Mine in Wiliamson County.

19. Phoenix classified Hedman as non-exempt and paid him by the hour.

20. Throughout his employment, Phoenix subjected Hedman to its pre/post shift off the clock policy, per diem pay scheme, and vacation policy.

21. Hedman brings this class and collective action on behalf of himself and similarly situated employees.

22. Hedman seeks to represent a collective under the FLSA defined as:

> **All hourly Phoenix employees who worked in Illinois at any time during the past 3 years through final resolution of this Action (the "FLSA Collective Members").**

23. Hedman seeks to represent a class under the IMWL defined as:

> **All hourly Phoenix employees who worked in Illinois at any time during the past 3 years through final resolution of this Action (the "IMWL Class Members").**

24. Hedman seeks to represent a class under the IWPCA defined as:

> **All hourly Phoenix employees who worked in Illinois at any time during the past 10 years through final resolution of this Action (the "IWPCA Class Members").**

25. The FLSA Collective Members, IMWL Class Members, and IWPCA Class Members are collectively referred to as the "Hourly Employees."

26. Phoenix is a Colorado limited liability company headquartered in Grand Junction, Colorado.

27. Phoenix may be served through its registered agent: **Registered Agents Inc., 2501 Chatham Rd., Suite R, Springfield, Illinois 62704**.

**FLSA COVERAGE**

28. At all relevant times, Phoenix was an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

29. At all relevant times, Phoenix was an "enterprise" within the meaning of the FLSA. 29 U.S.C. § 203(r).

30. At all relevant times, Phoenix was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling,

or otherwise working on goods or materials—such as cell phones, tools, and personal protective equipment—that have been moved in or produced for commerce. 29 U.S.C. § 203(s)(1).

31. At all relevant times, Phoenix had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

32. At all relevant times, Hedman and the other Hourly Employees were Phoenix's "employees" within the meaning of the FLSA. 29 U.S.C. § 203(e).

33. At all relevant times, Hedman and the other Hourly Employees were engaged in commerce or in the production of goods for commerce.

## FACTS

34. Phoenix is a mining staffing company that provides workers for surface and underground mines.

35. To meet its business objectives, Phoenix hires workers like Hedman and the other Hourly Employees.

36. For example, Phoenix employed Hedman as a buggy operator from approximately January 2024 through June 2025, including in Phoenix's client's Mach #1 Mine in Williamson County, Illinois from approximately April 2025 through June 2025.

37. Hedman typically worked approximately 12 hours a day and 7 days a week "on the clock" (84 hours a workweek).

38. Phoenix paid Hedman approximately $44.50 an hour.

39. Hedman's job duties included operating the underground coal buggy, maintaining mine sections, bolting, and pulling pillars after coal extracted.

40. Hedman's job duties likewise included donning and doffing his safety gear, traveling into and out of the mine, and showering, before and after his shifts, while on Phoenix's and its client's premises.

41. But Phoenix did not pay Hedman for all hours worked.

42. Instead, Phoenix subjected Hedman to its pre/post shift off the clock policy.

43. Specifically, Phoenix required Hedman to prepare and don required gear (including hard hat, headlamp, reflective clothing, dust mask, respirator, gas detector, self-contained self-rescuer (SCSR), ear protection, metatarsal boots, safety glasses, proximity box tracker, miner belt), while on Phoenix's client's premises "off the clock," without compensation.

44. This takes Hedman approximately 45 minutes to an hour each workday.

45. Hedman could not perform his job duties as a buggy operator in accordance with Phoenix's policies, procedures, and expectations without this gear.

46. Hedman could not safely perform his job duties in accordance with Phoenix's policies, procedures, and expectations without this gear.

47. Indeed, much of the safety gear Hedman must utilize is mandated by federal regulation. *See* 30 C.F.R. § 75, *et seq.*; 30 C.F.R. § 77, *et seq.*; *see also* 29 C.F.R. § 1910.132.

48. The donning of this gear is therefore integral and indispensable for Hedman because it is inextricably intertwined with his other job duties.

49. Likewise, Phoenix requires Hedman to exit the mine, remove and store his gear, and shower each workday after his scheduled shift, on Phoenix's client's premises "off the clock," without compensation.

50. This takes Hedman approximately 30 to 45 minutes each workday.

51. Hedman could not perform his job duties in accordance with Phoenix's policies, procedures, and expectations without removing their safety gear, storing their tools and equipment, and washing up each workday, all while on Phoenix's client's premises.

52. Hedman and the other Hourly Employees perform their jobs under Phoenix's supervision, in accordance with Phoenix's (and its client's) policies and procedures, and use materials, equipment, and technology Phoenix approves and supplies.

53. Like Hedman, the other Hourly Employees work approximately 12 hours a day and 7 days a week (84 hours a workweek).

54. At the end of each pay period, Hedman and the Hourly Employees receive wages from Phoenix that are determined by common systems and methods that Phoenix selects and controls.

55. But, like Hedman, Phoenix does not pay the other Hourly Employees for all their hours worked.

56. Specifically, like Hedman, Phoenix requires the other Hourly Employees to prepare and don required gear (including hard hat, headlamp, reflective clothing, dust mask, respirator, gas detector, self-contained self-rescuer (SCSR), ear protection, metatarsal boots, safety glasses, proximity box, walkie talkie, tracker, miner belt), while on Phoenix's client's premises "off the clock," without compensation.

57. The Hourly Employees could not perform their mining job duties in accordance with Phoenix's policies, procedures, and expectations without this gear.

58. They could not safely perform his job duties in accordance with Phoenix's policies, procedures, and expectations without this gear.

59. Indeed, as with Hedman, much of the safety gear is mandated by federal regulation. *See* 30 C.F.R. § 75, *et seq.*; 30 C.F.R. § 77, *et seq.*; *see also* 29 C.F.R. § 1910.132.

60. The donning of this gear is therefore integral and indispensable for the Hourly Employees because it is inextricably intertwined with their other job duties such that they could not effectively perform their jobs without preparing and donning this gear each workday.

61. Likewise, Phoenix requires the Hourly Employees to exit the mine, remove and store their gear, and shower each workday after their scheduled shifts, on Phoenix's client's premises "off the clock," without compensation.

62. Exiting the mine, removing and storing their gear, and showering each day are therefore integral and indispensable work duties for the other Hourly Employees.

63. But under its pre/post shift off the clock policy, Phoenix does not compensate the other Hourly Employees for the same.

64. This takes the Hourly Employees approximately an hour and 15 minutes to an hour and 45 minutes each workday.

65. Thus, Phoenix requested, suffered, or permitted Hedman and the other Hourly Employees to work "off the clock" before and after their shifts, on its client's premises, without compensation.

66. Despite accepting the benefits, Phoenix does not pay Hedman and the other Hourly Employees for this compensable work.

67. As a result of its pre/post shift off the clock policy, Phoenix fails to pay Hedman and the other Hourly Employees overtime wages for all their overtime hours worked in violation of the FLSA and IMWL.

68. And under Phoenix's pre/post shift off the clock policy, Hedman and the other Hourly Employees are denied earned wages, at the agreed rates, for hours worked that Phoenix agreed to pay them, in violation of the IWPCA.

69. Additionally, Phoenix failed to pay Hedman and the other Hourly Employees at least 1.5 times their regular rates of pay, based on all remuneration, for all hours worked in excess of 40 in a workweek.

70. Instead, Phoenix paid them under its per diem pay scheme.

71. Specifically, Phoenix pays Hedman and the other Hourly Employees "per diems" of approximately $150 each workday that it excludes from their regular rates of pay for overtime purposes.

72. But Phoenix does not calculate the "per diems" to reasonably approximate expenses incurred on its behalf by Hedman and the Hourly Employees.

73. Rather, Phoenix pays the "per diems" only on days they actually work and regardless of whether the Hourly Employees are working away from home overnight.

74. Thus, Phoenix's per diem pay scheme violates the FLSA and IMWL by failing to compensate Hedman and the other Hourly Employees at rates of at least 1.5 times their regular rates of pay, based on all remuneration, for all hours worked in excess of 40 in a workweek.

75. Finally, Phoenix violated the IWPCA by failing to pay Hedman and other separated Hourly Employees all final compensation upon termination of employment.

76. Specifically, Phoenix failed to pay Hedman and other separated Hourly Employees the monetary equivalent of all earned vacation.

## Class and Collective Action Allegations

77. Hedman brings his claims as a class and collective action on behalf of himself and the other Hourly Employees.

78. Like Hedman, the other Hourly Employees are victimized by Phoenix's pre/post shift off the clock policy, per diem pay scheme, and/or its failure to pay all final compensation.

79. The putative classes include at least 40 members.

80. Other Hourly Employees worked with Hedman and indicated they were paid in the same or similar manner, performed similar work, and were subject to Phoenix's same or similar pre/post shift off the clock policy, per diem pay scheme, and/or failure to pay all final compensation under its vacation policy.

81. Based on his experience with Phoenix, Hedman is aware Phoenix's pre/post shift off the clock policy, per diem pay scheme, and vacation policy were imposed on other Hourly Employees.

82. The Hourly Employees are similarly situated in the most relevant respects.

83. Even if their job duties and locations might vary, these differences do not matter for the purpose of determining their entitlement to earned wages and overtime wages.

84. Rather, the Hourly Employees are held together by Phoenix's pre/post shift off the clock policy, per diem pay scheme, and vacation policy, which systematically deprive Hedman and the other Hourly Employees of earned wages for all hours worked and overtime wages, at the required rates, for overtime hours worked.

85. Therefore, the specific job titles or locations of the Hourly Employees do not prevent class or collective treatment.

86. Phoenix's failure to pay these employees "straight time" wages, overtime wages, and final compensation at the agreed rates required by the FLSA, IMWL, and/or IWPCA for hours worked results from generally applicable, systematic policies and practices that are not dependent on the personal circumstances of the Hourly Employees.

87. The IWPCA Class Members are denied earned wages (at their agreed hourly rates) for all agreed hours worked when they work fewer than 40 hours in a workweek, as well as final compensation for accrued but unused vacation.

88. The FLSA Collective Members and IMWL Class Members are similarly denied overtime wages at the required premium rates for overtime hours worked.

89. Phoenix's records reflect the number of "on the clock" hours the Hourly Employees work each workweek.

90. Phoenix's records likewise reflect that it paid "per diems" to the Hourly Employees that it failed to include in their regular rates of pay for overtime purposes.

91. Finally, Phoenix's records reflect it failed to pay former Hourly Employees for accrued but unused vacation upon separation of employment.

92. The back wages owed to Hedman and the other Hourly Employees can therefore be calculated using the same formula applied to the same records.

93. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Phoenix's records, and there is no detraction from the common nucleus of liability facts.

94. Therefore, the issue of damages does not preclude class or collective treatment.

95. Hedman's experiences are typical of the experiences of the other Hourly Employees.

96. Hedman has no interest contrary to, or in conflict with, the other Hourly Employees that would prevent class or collective treatment.

97. Hedman has an interest in obtaining the unpaid wages owed to the Hourly Employees under federal and Illinois law.

98. A class and collective action is superior to other available means for fair and efficient adjudication of this lawsuit.

99. Absent this class and collective action, many Hourly Employees will not obtain redress for their injuries, and Phoenix will reap the unjust benefits of violating federal and Illinois law.

100. Further, even if some of the Hourly Employees could afford individual litigation, it would be unduly burdensome to the judicial system.

101. Indeed, the multiplicity of actions would create hardship to the Hourly Employees, the Court, and Phoenix.

102. Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

103. The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual class members.

104. Among the common questions of law and fact are:

a. Whether Phoenix's pre/post shift off the clock policy failed to compensate the Hourly Employees for all hours worked.

b. Whether Phoenix's pre/post shift off the clock policy deprived the Hourly Employees of overtime wages when they worked more than 40 hours in a workweek; and

c. Whether Phoenix's pre/post shift off the clock policy deprived the Hourly Employees of earned wages for all hours worked, at their agreed rates;

d. Whether Phoenix's per diem pay scheme deprived the Hourly Employees of overtime wages of at least 1.5 times their regular rates of pay, based on all remuneration, for all overtime hours;

e. Whether Phoenix failed to pay separated Hourly Employees the monetary equivalent of accrued but unused vacation.

f. Whether Phoenix's decision not to pay the Hourly Employees overtime wages at the required rates—based on all remuneration—for all overtime hours worked was made in good faith; and

g. Whether Phoenix's violations were willful.

105. Hedman knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class action.

106. There are many similarly situated Hourly Employees who have been denied overtime wages of at least 1.5 times their regular rates of pay—based on all remuneration—in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

107. The Hourly Employees are known to Phoenix, are readily identifiable, and can be located through Phoenix's business and personnel records.

## PHOENIX'S VIOLATIONS WERE WILLFUL

108. Phoenix knew it employed Hedman and the other Hourly Employees.

109. Phoenix knew it was subject to the FLSA's overtime provisions.

110. Phoenix knew the FLSA required it to pay non-exempt employees, including Hedman and the other Hourly Employees, overtime wages at rates of at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

111. Phoenix knew Hedman and each Hourly Employee worked more than 40 hours in at least one workweek during the last 3 years because these employees were required to report their "on the clock" hours via Phoenix's timekeeping system.

112. Phoenix knew Hedman and the other Hourly Employees were non-exempt employees entitled to overtime pay.

113. Phoenix knew it did not track and pay the Hourly Employees for compensable work performed donning and doffing their gear before and after their shifts.

114. Phoenix knew it paid Hedman and the other Hourly Employees "per diems."

115. Phoenix knew it was required to include these "per diems" in their regular rates of pay.

116. Phoenix knew these "per diems" were not included in Hedman's and the other Hourly Employees' regular rates of pay for overtime purposes.

117. And Phoenix knew the FLSA requires it to pay Hedman and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

118. Phoenix's failure to pay Hedman and the other Hourly Employees overtime at the required rate—based on all remuneration—for all overtime hours worked was neither reasonable, nor was this decision made in good faith.

119. Phoenix knowingly, willfully, and/or in reckless disregard of the FLSA carried out its unlawful pre/post shift off the clock policy and per diem pay scheme that deprived Hedman and the other Hourly Employees of overtime wages of at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked after 40 a workweek.

## COUNT I
## FAILURE TO PAY OVERTIME UNDER THE FLSA
## (FLSA COLLECTIVE)

120. Hedman brings his FLSA claim as a collective action on behalf of himself and the other Hourly Employees pursuant to 29 U.S.C. § 216(b).

121. Phoenix violated, and is violating, the FLSA by employing non-exempt employees such as Hedman and the other Hourly Employees in a covered enterprise for workweeks longer than

40 hours without paying them overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for the hours they worked in excess of 40 a workweek.

122. Phoenix's unlawful conduct harmed Hedman and the other Hourly Employees by depriving them of the overtime wages they are owed.

123. Accordingly, Phoenix owes Hedman and the other Hourly Employees the difference between the wages actually paid and the required overtime wages actually earned.

124. Because Phoenix knew or showed reckless disregard for whether its pre/post shift off the clock policy and per diem pay scheme violated the FLSA, Phoenix owes Hedman and the other Hourly Employees these wages for at least the past 3 years.

125. Phoenix is also liable to Hedman and the other Hourly Employees for an amount equal to all their unpaid overtime wages as liquidated damages.

Finally, Hedman and the other Hourly Employees are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

## COUNT II
## FAILURE TO PAY OVERTIME WAGES UNDER THE IMWL
## PURSUANT TO 820 ILCS 105/1, *ET SEQ.*
## (IMWL CLASS)

126. Hedman brings his IMWL claim on behalf of himself and the other IMWL Class Members.

127. The conduct alleged violates the IMWL (820 ILCS 105/1, *et seq*.).

128. At all relevant times, Phoenix was an "employer" within the meaning of the IMWL.

129. At all relevant times, Phoenix employed the IMWL Class Members as covered "employees" within the meaning of the IMWL.

130. The IMWL requires employers, like Phoenix, to pay employees, such as the IMWL Class Members, overtime wages at rates of at least 1.5 times their regular rates of pay, based on all remuneration, for all hours worked in excess of 40 in a workweek.

131. The IMWL Class Members are entitled to overtime wages under the IMWL.

132. Phoenix violated, and is violating, the IMWL by failing to pay the IMWL Class Members overtime wages at rates of at least 1.5 times their regular rates of pay, based on all remuneration, for all hours worked in excess of 40 in a workweek, including for hours worked "off the clock." *See* 820 ILCS 105/4a.

133. Phoenix's unlawful conduct harmed the IMWL Class Members by depriving them of the overtime wages owed.

134. Accordingly, the IMWL Class Members are entitled to recover their earned but unpaid overtime wages from the 3 years prior to the filing of this Complaint, treble damages, and monthly statutory damages on these amounts at the highest applicable rates, plus attorneys' fees, costs, and expenses. *See* 820 ILCS 105/12(a).

**COUNT III**
**FAILURE TO PAY ALL WAGES UNDER THE IWPCA**
**PURSUANT TO 820 ILCS 115/1, *ET SEQ.***
**(IWPCA CLASS)**

135. Hedman brings his IWPCA claim on behalf of himself and the IWPCA Class Members.

136. The conduct alleged violates the IWPCA. 820 ILCS 115/1, *et seq*.

137. At all relevant times, Phoenix was an "employer" within the meaning of the IWPCA.

138. At all relevant times, Phoenix employed the IWPCA Class Members as covered "employees" within the meaning of the IWPCA.

139. The IWPCA requires employers, like Phoenix, to pay employees, like the IWPCA Class Members, for all hours of work, as agreed between the parties, at the rate(s) agreed to by the parties. 820 ILCS 115/2.

140. During the course of their employment, Phoenix agreed to pay each IWPCA Class Member an hourly rate for all the hours of work they performed, plus overtime.

141. Each IWPCA Class Member accepted Phoenix's offer.

142. But, Phoenix failed to pay the IWPCA Class Members for all the hours Phoenix agreed to pay them, at the rate(s) Phoenix agreed to pay them because Phoenix failed to include time these employees worked "off the clock" before and after their shifts in their total number of hours worked each workday.

143. Phoenix violated, and is violating, the IWPCA by failing to pay Hedman and the other IWPCA Class Members all their earned wages (at the rate(s) Phoenix agreed to pay them) for all the hours of work Phoenix agreed to pay them, including the work they performed "off the clock" before and after their shifts.

144. The IWPCA also requires employers, like Phoenix, to pay employees, like the IWPCA Class Members the monetary equivalent of earned vacation as part of their final compensation upon separation of employment. 820 ILCS 115/2.

145. But, Phoenix failed to pay the former IWPCA Class Members the monetary equivalent of earned vacation as part of their final compensation upon separation of employment.

146. Phoenix's unlawful conduct harmed Hedman and the other IWPCA Class Members by depriving them of the wages they earned and are owed.

147. Accordingly, Hedman and the IWPCA Class Members are entitled to recover their unpaid earned wages and/or final compensation (at their agreed hourly rate(s)) owed from the 10

years prior to the filing of this Complaint, as well as monthly statutory damages on these amounts at the highest applicable rates, plus attorneys' fees, costs, and expenses. *See* 820 ILCS 115/14(a).

## JURY DEMAND

148. Hedman demands a trial by jury on all Counts.

## RELIEF SOUGHT

WHEREFORE, Hedman, individually and on behalf of the other Hourly Employees, seeks the following relief:

a. An Order designating this lawsuit as a collective action and authorizing notice to the Hourly Employees allowing them to join this action by filing a written notice of consent;

b. An Order allowing this action to proceed as a class action under the IMWL and IWPCA and certifying the putative classes of Hourly Employees;

c. An Order appointing Hedman and his counsel to represent the interests of the Hourly Employees;

d. An Order finding Phoenix liable to the Hourly Employees for unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

e. An Order finding Phoenix liable to Hedman and the IMWL Class Members for unpaid overtime wages owed under the IMWL, treble damages, as well as monthly statutory damages at the rate of 5% per month in the amount of the underpayment;

f. An Order finding Phoenix liable to Hedman and the IWPCA Class Members for unpaid "straight time" wages owed under the IWPCA, as well as monthly statutory damages at the rate of 5% per month in the amount of the underpayment;

g. A Judgment against Phoenix awarding Hedman and the other Hourly Employees all their unpaid overtime wages, liquidated damages, treble damages, monthly statutory damages, and any other penalties available under the FLSA, IMWL, and IWPCA;

h. An Order awarding attorneys' fees, costs, and expenses to the hourly employees;

i. Pre- and post-judgment interest at the highest applicable rates; and

j. Such other and further relief as may be necessary and appropriate.

September 17, 2025

Respectfully submitted,

**WERMAN SALAS P.C**

*/s/ Douglas M. Werman*
Douglas M. Werman
dwerman@flsalaw.com
Maureen A. Salas
msalas@flsalaw.com
77 W. Washington St., Ste 1402
Chicago, IL 60602
Phone: (312) 419-1008
Fax: (312) 419-1025

Michael A. Josephson*
Andrew W. Dunlap*
**JOSEPHSON DUNLAP, LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046

Phone: (713) 352-1100
Fax: (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch*
**BRUCKNER BURCH, PLLC**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
Phone: (713) 877-8788
Fax: (713) 877-8065
rburch@brucknerburch.com

**Pro Hac Vice Application Forthcoming*

**ATTORNEYS FOR HEDMAN AND THE HOURLY EMPLOYEES**